Rockingham, }
March 5, 1907. }

KIDD & a. v. NEW HAMPSHIRE TRACTION CO. & a.

Officers appointed by a board of directors to execute a written contract in behalf of a corporation are representatives of the company, and not agents of the directors; and their authority is not *ipso facto* abrogated by the election of new directors prior to the signing of the agreement.

Where the directors of a corporation dispose of all its property in accordance with the terms of a written agreement which the officers of the company are instructed to execute and deliver, the transaction is not void on the ground of constructive fraud merely because persons under the control of the vendee are substituted for the original directors prior to the manual execution of the contract.

A sealed contract of sale and a contemporaneous parol agreement binding the vendor to make additional expenditures as a consideration for the vendee's execution of the deed do not together constitute a single indivisible contract; and the fact that the parol agreement is void, or voidable at the option of the vendor, does not affect the validity of the vendee's title under the deed.

An issue of intentional fraud raised by bill and answer, but not passed upon by the superior court, will not be determined by the supreme court upon the reversal of a decree based entirely upon constructive fraud.

A motion to dismiss a bill in equity for lack of sufficient evidence to support its allegations should be made at the close of the plaintiff's evidence, before the issues are submitted upon their merits.

The relation existing between common stockholders who have entire control of the corporation and preferred shareholders without voting power is that of trustee and *cestui que trust.*

All stipulations by parol prior to or contemporaneous with a written agreement are merged in the writing, which is conclusively presumed, in the absence of fraud or mistake, to contain the matter as to which the minds of the parties met; and where the final expression and purpose of the parties is by a writing under seal, all other matter in writing is parol and is merged in the sealed instrument, which cannot be altered or contradicted by a prior or contemporaneous document of less degree.

A trustee *ex maleficio* is in any event chargeable with the value of the trust estate at the time it came into his possession; and upon the question of value, subsequent developments of the property are evidence, but not conclusive.

BILL IN EQUITY, by two holders of preferred stock in the Massachusetts Construction Company Incorporated, in behalf of themselves and all other stockholders of the corporation, alleging in part, in substance, that as a result of fraud all the assets of the corporation have passed into the possession and control of the New York Security and Trust Company, one of the defendants, and praying for an accounting by the latter company. This is the same suit reported in 72 N. H. 273. There was a trial by the court. A general decree was made in favor of the plaintiffs against the Trust Company, and the bill was dismissed without costs as to the other defendants. The facts and rulings upon which the decree was based, together with the defendants' exceptions thereto, were transferred from the October term, 1905, of the superior court by *Peaslee,* J.; and so far as material to the disposition of the case, they are stated in the opinion.

*Roger F. Sturgis* (of Massachusetts) and *Streeter & Hollis,* for the plaintiffs.

*William B. Hornblower* and *J. Norris Miller* (both of New York) and *Sargent, Remick & Niles,* for the New York Security and Trust Company.

*Storey, Thorndike, Palmer & Thayer* and *Samuel W. Emery* (all of Massachusetts) and *Sargent, Remick & Niles,* for the New Hampshire Traction Company.

*Burnham, Brown, Jones & Warren,* for the Massachusetts Construction Company Incorporated and Wallace D. Lovell.

CHASE, J. Wallace D. Lovell, a promoter and builder of street railways, doing business in the name of incorporated companies whose stock he owned and whose affairs he controlled, borrowed money of the plaintiffs from time to time, beginning in 1897, to

such an extent that in the fall of 1901 he and his company were owing the plaintiff Kidd about $179,000, and the plaintiff Whitcomb $65,000. In October, 1901, the Massachusetts Construction Company Incorporated (Connecticut Company) was formed under the general laws of Connecticut, and took the assets and assumed the liabilities of the Massachusetts Construction Company (Massachusetts Company), in whose name Lovell had previously conducted the business. The Connecticut Company's capital stock is $500,000, of which $250,000 is preferred, both as to the payment of dividends and the par value of the stock upon liquidation, and has no voting power, that being wholly lodged in the owners of the common stock. Lovell induced the plaintiffs to surrender the notes and collaterals which they held for their loans and to take in payment preferred stock of the Connecticut Company, Kidd taking 1,790 shares and Whitcomb 650 shares. The plaintiffs now hold this stock.

Lovell borrowed of the defendant, the New York Security and Trust Company (Trust Company), in 1900 and 1901, large sums of money upon notes secured by pledges of stocks and bonds of the railway corporations whose roads he and his corporation constructed. The Trust Company also purchased bonds of some of these railway corporations in the summer of 1900. By a contract, dated November 12, 1901, the Massachusetts Company and the Connecticut Company sold and conveyed to the Trust Company all their interests in large blocks of the stocks and bonds of the railway corporations. The contract provided that the Trust Company should organize, or cause to be organized, under the laws of this state, a holding corporation, to which the stocks and bonds received by the Trust Company under the contract, with certain exceptions, should be sold upon the terms set forth in the contract; and that the Massachusetts Company and the Connecticut Company should be paid for their equity in the stocks and bonds so sold to the Trust Company, by portions of the stock and bonds to be issued by the holding corporation. The Trust Company thereupon caused the New Hampshire Traction Company (Traction Company) to be organized, and the sale was made to it as provided in the contract.

Another contract under seal, dated December 28, 1901, between the Construction Companies, the Trust Company, and Lovell was prepared, by which the Construction Companies sold and conveyed to the Trust Company, and the Trust Company purchased of the Construction Companies, all their right, title, and interest in and to the stock and bonds of the Traction Company received under the contract of November 12, and in and to certain railway stocks, bonds, and claims, in consideration of $639,163.75 in cash (to be

used in the payment of the debts of the Construction and Railway Companies), debenture bonds of the Traction Company amounting to $375,000, a certificate of the Trust Company providing that 2,375 shares of the Traction Company's stock should be delivered to the Connecticut Company, January 1, 1907, and certain covenants of the Trust Company. The Construction Companies covenanted that their indebtedness and that of the railway corporations together did not exceed $639,163.75, and pledged the debenture bonds and interest in stock received by them under the contract to secure this covenant. The Trust Company agreed to furnish money to complete certain railways and to cause Lovell to be retained in and about the construction of the same for the term of two years, at an annual salary of $6,000 and necessary disbursements. The Construction Companies agreed that all construction might be done in the name of the Connecticut Company,—the Trust Company to pay all bills incurred with its consent, and to indemnify the Connecticut Company for all expenses, costs, and liabilities arising from any act, contract, or omission of the company while its control was in the Trust Company as provided in the contract. The Trust Company further agreed to sell and assign to the Traction Company the stock and bonds received and to be received by it under the contract, upon certain terms. The contract also provided for the substitution of persons desired by the Trust Company for the officers and directors of the Construction Companies then in office, as is hereinafter stated,—the officers and directors so substituted to have the right to make such changes in the by-laws as they might think desirable. Lovell was to furnish stock to qualify the officers and directors so substituted, and was to deposit with parties named certificates for all the common stock of the Connecticut Company, indorsed in blank, as security for the faithful performance by him and the Construction Companies of the covenants, terms, and conditions of the contract. By the twelfth article of the contract, it was "expressly understood and agreed that in so far as the Trust Company is concerned this contract shall not take effect until the examination now being made by the representatives of the Trust Company of the properties, rights, privileges, and franchises of the various companies shall be completed, and shall not then take effect unless the report of the engineers and accountants making such examination shall be entirely satisfactory to the said Trust Company."

This contract was laid before the directors of the Connecticut Company at a meeting held December 31, 1901, and the action was taken which appears later in this opinion. Immediately following this action, three of the five directors resigned, and Trust Company nominees were elected in their stead.

January 3, 1902, the Trust Company wrote Lovell, as president of the Construction Companies, as follows: "Referring to the agreement of December 28, 1901, between [naming the parties], we beg to advise you that the examinations made by us under article XII of said contract have been completed; that the results of said examinations are satisfactory to us, and that we are prepared to accept said contract upon the express understanding and agreement on the part of the Massachusetts Construction Company and the Massachusetts Construction Company Incorporated that they will furnish and pay for the work, materials, and machinery necessary for the entire completion of the high tension service on all of the roads now constituting the New Hampshire Traction Company, including rotaries, wiring, etc., and that there shall be no claim whatsoever against the New Hampshire Traction Company . . . on account of the completion of said high tension service." To this the Construction Companies, by their president, Lovell, replied in their corporate names, under the same date, "that the same is in all respects entirely satisfactory to the Massachusetts Construction Company and the Massachusetts Construction Company Incorporated, the said companies agreeing to furnish and pay for all the work, materials, and machinery necessary for the said high tension service." There was no other acceptance of the modified contract, except by implication from action subsequently taken under it. The sale was of all the assets of the Connecticut Company.

The Trust Company subsequently sold to the Traction Company the securities mentioned in the contract. These securities represented an outlay by the Trust Company of $1,247,163.75; and it received therefor from the Traction Company bonds, apparently worth at that time $1,958,945.47. This shows a profit of $711,781.72; and the Trust Company was required by the court's decree to account to the plaintiffs for this sum, so far as necessary to satisfy their claims as holders of preferred stock of the Connecticut Company. It was also found that the value of these securities, if determined by subsequent developments, was never as much as the Trust Company paid for them.

The Trust Company's title to the securities in question depends upon this contract of December 28. The company says it acquired a legal and absolute title to these securities by virtue of this contract and its subsequent acts in fulfilment of the provisions of the contract. This claim must be sustained if the contract was duly executed and is not void or voidable for any reason. The plaintiffs, in their bill, do not question the due execution of the contract, but allege that it is void because it was procured from the Construction Companies by means of a conspiracy to defraud the

plaintiffs, in which the Trust Company was an active party. Briefly stated, the plaintiffs' claim as alleged in their bill is, that although the contract was executed—signed, sealed, and delivered—by the parties, it is void because it is the product of conspiracy and fraud participated in by the Trust Company. The defendants, in their answers, deny the conspiracy and fraud, and the issue thus raised appears to have been the one that was tried. But in the view which the superior court took of the facts and the law applicable thereto, it was deemed by him to be unnecessary to pass upon the issue of intentional fraud, and he did not do so. He disposed of the case on the sole ground that the contract was voidable by the plaintiffs because of constructive fraud, or fraud in law. He made the following findings and ruling with reference to this matter: " From the time of its organization, the Traction Company was merely an agency controlled by the Trust Company. The same thing has been true of the Connecticut Company since December 31, 1901, at least. The so-called contract of December 28, as modified by the Trust Company January 3, if ever agreed to by the Connecticut Company, was so ratified after the Connecticut Company was controlled by the Trust Company. Taking the property in this way, the Trust Company is chargeable as trustee, and must account for the interest of the non-assenting preferred shareholders of the Connecticut Company." The Trust Company excepted to these findings of fact, because, as it alleges, the findings are not justified by the evidence. It also excepted to the ruling of law, and moved to set aside the decree in the plaintiffs' favor because of errors covered by these exceptions. The motion was denied, subject to exception.

As the court did not pass upon the question of intentional fraud, it must be regarded as a fact, for the present at least, that the Trust Company's apparent title under the contract of December 28 is not jeopardized or in any way affected by such fraud. If it is invalid, it must be wholly because of constructive fraud. The ruling of law excepted to seems to be based upon the idea that all the contractual provisions set forth in the instrument of December 28 and in the letters of January 3 together constitute a single, indivisible contract,—" the so-called contract of December 28, as modified by the Trust Company, January 3,"—which was never actually agreed to by the Connecticut Company, but, at most, was only ratified by the company by acquiescence and compliance with its provisions after it was supposed to be in effect, and this only after the company was controlled by the Trust Company. The Trust Company says the contract is not of this single, indivisible character, but is composed of a main contract evidenced by the instrument dated December 28 and a supplemental or col-

lateral contract evidenced by the letters. While it says that both contracts were executed by the Connecticut Company by agents thereto duly authorized, and denies that such execution was induced by its control of that company, it further says that any infirmity that may exist in the contract evidenced by the letters, whether arising from want of Lovell's authority to make the contract in behalf of the Connecticut Company, or from the Trust Company's control of the company at the time, cannot invalidate the main contract.

It must be borne in mind that the control found by the superior court has existed only since December 31, 1901, "at least." If the qualifying words "at least" imply that the control may have existed from an earlier date, they certainly do not imply that it did exist earlier. That was the day when a majority of the directors of the Connecticut Company resigned and Trust Company "nominees" were elected in their stead. It does not appear that the persons so elected were stockholders or officers of the Trust Company, or had any connection whatsoever with it other than being its nominees. Nor does it appear that they were hostile to the Connecticut Company, or had personal interests adverse to it or its stockholders. The significance of the term "nominees" appears from a consideration of the article in the contract of December 28, by which it is provided that "the present officers and directors of the Construction Companies shall resign, and there shall be elected as their successors such persons as the Trust Company may desire, who shall remain in office, at the pleasure of the Trust Company, until the final completion and carrying out of all the matters and things provided for in and by this contract." There is nothing in this provision which requires the directors elected in accordance with it to disregard or wrongly perform the duties which, under the law, they would owe the Connecticut Company and its stockholders, as directors. If the contract had not then been executed and gone into effect, as seems to be admitted, this change in the directors was obviously made provisionally, in expectation that it would soon become the contract of the parties. Another finding of the superior court is, that by the contract of December 28, the control of the Connecticut Company was turned over to the Trust Company,—evidently referring in part to the same provision of the contract. It appears from these findings that the control which the court made use of in applying the doctrine of constructive fraud to the case resulted from the contract; the contract did not arise from the control. Until the contract was understood to be in force, there was no control. If the contract was executed December 31, the control begun on that day; if it was not executed until January 3, the control would

not begin until that date. In the latter event, the directors elected December 31 as "Trust Company nominees" did not hold their positions, between that date and January 3, for the purpose of carrying the provisions of the contract into effect, for there was no contract. It does not follow, as matter of law, from the sole fact that they were "Trust Company nominees,"—such persons as the Trust Company desired,—that during this interval of time they were disqualified to act as directors upon matters pending between the Connecticut Company and the Trust Company, even if they would be so disqualified after the contract was executed and went into effect. The presumption, in the absence of all evidence to the contrary, is that they would act in the office of director in good faith and according to law. This presumption certainly is not weakened by the fact that the "nominees" were lawyers and, so far as appears, lawyers in good standing in their profession. If it appeared that they were elected for the purpose of controlling the Connecticut Company's discretion or will in the making of the contract, or that they were so far controlled by the Trust Company as to be subservient to its will, it might be that the law would regard them as disqualified even to the extent of being counted as directors in matters pending between the two corporations. But nothing of this kind appears in the record. Furthermore, it does not appear that they took any part whatsoever in negotiating for, or executing, the contract.

Recurring to the record of the meeting of the Connecticut Company directors held December 31, it appears that the directors present at the meeting were Lovell (the president of the corporation), Pride, and Barter, a majority of the board of five members. It is not found that these directors or either of them were controlled by the Trust Company, or were directors or stockholders of the company. Lovell was the owner of the common stock of the corporation. His interests, like the plaintiffs', and more vitally than theirs, were adverse to those of the Trust Company; for his rights in the Connecticut Company, as the owner of its common stock, were subordinate to those of the plaintiffs. The record of the meeting, after setting forth the fact that Lovell had been in negotiation with the Trust Company relating to the matters, stated that he laid before the directors "an agreement dated the 28th day of December, 1901, by and between [the parties, naming them], being as follows." Then follows a copy of the agreement in full. Thereupon, it was unanimously resolved by the directors that the officers of the company "be and they hereby are authorized and directed to make, execute, and deliver the said contract"; "that the execution of the said contract by the officers of this corporation in its name be and the same is hereby ratified

and confirmed and adopted as the valid and binding act of this
corporation "; and "that the officers of this company be and they
hereby are authorized and directed to do each and every and all
of the things necessary or desirable in order to give full force and
effect to the intention of the said contract, executing the transfers
and delivery of the securities therein set forth." Thus it is seen
that the corporation acted directly upon the contract through its
directors. The directors themselves wholly exercised the discre-
tion and will of the corporation in respect to the making of the
contract. The only power or authority delegated by them to
others was the authority to perform the ministerial acts of execut-
ing and delivering the contract. This authority did not include
authority for an exercise of discretion by the officers to whom it
was delegated, for they were expressly directed by the votes to
execute and deliver the contract. It is difficult to imagine a more
emphatic and complete execution of the powers of a corporation
by its directors than was this action of the Connecticut Company.
The by-laws of the corporation provided that "the property affairs
and business of the corporation shall be managed by the directors,
who may exercise all such powers of the corporation as are not by
law or by the charter or by-laws required to be otherwise exer-
cised, subject however to the control of the common stockholders;
but no action by the common stockholders shall invalidate any
prior act of the directors." There is no provision in the charter
or elsewhere in the by-laws requiring the powers exercised in the
making of contracts to be exercised otherwise than by the direc-
tors. The common stockholders could not by subsequent action,
if they would, invalidate the directors' action in this case. In
fact, Lovell, the owner of the common stock, appears from the
record of the directors' meeting to have been the originating, mov-
ing, and guiding spirit in the transaction. These by-laws are in
harmony with the law as to the powers of directors. P. S., c. 149,
s. 3; *Charlestown etc. Co.* v. *Dunsmore,* 60 N. H. 85; *Wait* v. *Asso-
ciation,* 66 N. H. 581, and authorities cited; *Goodwin* v. *Company,*
24 Conn. 591; 2 Cook Stock & Stockh., ss. 708–712; 10 Cyc.
758; 21 Am. & Eng. Enc. Law (2d ed.) 863. It further appears
that the authority and direction thus given the officers of the cor-
poration were exercised and followed. The contract is signed
·"Massachusetts Construction Company Incorporated, by W. D.
Lovell, president,—Attest, Edwin L. Pride, secretary," and a seal
is attached to the signature. Pride was secretary of the corpora-
tion, and according to the by-laws had the custody of the corpo-
rate seal. That the corporation's power to make such a contract
was ample distinctly appears from its certificate of incorporation,
which, after setting forth that the corporation was organized for

the purpose of constructing and equipping railroads, street railways, electric light and power plants, and other works of public and private utility, and of purchasing, holding, selling, pledging, or otherwise disposing of stocks, bonds, and securities of corporations, etc., etc., contains the following provisions: "To allow or cause the legal estate and interest in any business or property acquired, established, or carried on by the corporation to remain, to be vested or registered in the name of, and carried on by, any individual, or by any foreign or other corporation or company formed or to be formed, and either upon trust for, or as agents or nominees of this corporation, or upon any other terms or conditions which the board of directors may consider for the benefit of this corporation," and "to carry out all or any of the foregoing objects in any part of the world, as principals or agents, and alone or in partnership with, or for the joint account of, the corporation and any corporation, company, firm, or association or person, and to do all such other things as are incident or conducive to the attainment of the above objects." These powers are sufficiently comprehensive to include the making of a contract like that under consideration, even if the contract constituted the Connecticut Company the agent of the Trust Company to complete and carry out all the matters and things provided for by it, as therein stipulated.

In view of these facts, it must be held that the contract of December 28 was made and executed by the corporation, even if, as the parties seem to agree, it was not in fact executed until January 3, unless the change in directors, December 31, *ipso facto* abrogated the authority delegated to the officers of the corporation just before the change, or unless the contract is so intimately and inseparably connected with the agreement contained in the letters of January 3 relating to the high tension service that any infirmity there may be in that agreement also exists in the sealed instrument.

The officers appointed by the directors, December 31, to execute the contract of December 28 became thereby agents of the corporation—not agents of the directors. It is true that the directors were at liberty, if they saw fit, to withdraw the corporation's assent to the contract any time before it was agreed to by the Trust Company, and to revoke the authority delegated to the officers of the corporation in respect to the execution and delivery of the contract. But, as has been previously suggested, the mere fact that the new directors elected December 31 were Trust Company nominees did not, as matter of law, disqualify them from holding the office between that time and the execution of the contract, although the subject of making the contract was pending. There were five

directors during this time,—a full board,—two whose independence of the Trust Company is not questioned and the three Trust Company nominees. The corporation certainly was not disabled from acting by the want of a sufficient number of directors to constitute a quorum. *Non constat,* that the new directors, as well as the two holding over (Lovell and Pride), did not act in good faith and in fulfilment of their legal duties as directors, by omitting to take steps to have the action of December 31 reconsidered. The action of the majority of the old board of directors in resigning would justify the new directors in the belief that the corporation intended, at least, to give the Trust Company a reasonable time in which to act upon the contract, and not to withdraw its assent thereto in the meantime. It is a fair inference from the omission of the directors to take steps to reconsider the votes passed December 31, that they, the same as the directors who passed the votes and the same as the plaintiffs after they learned of the contract, considered the contract advantageous to the Connecticut Company and its stockholders. There is certainly nothing in this omission having a tendency to prove bad faith on the part of the directors, or control of them by the Trust Company. If the contract was not formally executed until January 3, the corporation was then, and during all the intervening time, provided with directors capable of exercising its will and discretion, and, so far as appears, not disqualified to act. The change in directors, December 31, did not, as matter of law, abrogate the authority and direction which the officers of the corporation had just received to execute the contract of December 28; but such authority and direction continued in force until they were exercised and followed, whether on January 3 or earlier. Such execution of the contract bound the Connecticut Company and rendered any other acceptance of the contract unnecessary.

The question remains, whether the contract evidenced by the sealed instrument is so intimately and inseparably connected with the agreement contained in the letters of January 3 that it must fall if that falls. Assuming, as the parties practically agree, that the contract of December 28 was delivered completely executed and the letters were exchanged at one and the same time on January 3, the question is, whether they form a single, indivisible contract. The answer depends upon the intention of the parties as shown by the terms and formal character of the documents which they used to express their intention, when read in the light of the circumstances under which the documents were made: 4 Wig. Ev., ss. 2430 *et seq.,* 2442. In other words, the court is called upon to interpret the documents. This is a question of law, the decision of which is reviewable in this court. *Prescott v.*

*Hayes*, 43 N. H. 593; *Kendall* v. *Green*, 67 N. H. 557, and numerous authorities there cited. Referring to the formal character of the documents, the contract of December 28 is a sealed instrument,—a specialty or deed,—while the letters are not under seal, and the promise evidenced by them is a simple contract merely. If the letters had been exchanged prior to the execution of the deed, the presumption would be strong, if not conclusive, that the promise contained in them was finally merged in the deed. But if the deed and the letters were exchanged at one and the same time, this presumption is not so strong. If a merger had been intended, there would be no need of the letters. The fact that they were exchanged at the time the execution of the deed was completed has a strong tendency to prove an intention that they, as well as the deed, should have effect. Although the letters specifically refer to the deed, they do not purport to be a part of it, or to vary its provisions in any respect. The deed could be altered or modified only by an instrument of as high nature as itself; it could not be altered by a parol agreement such as the letters constituted. *Wendell* v. *Bank*, 9 N. H. 404, 419; *McMurphy* v. *Garland*, 47 N. H. 316, 321, and authorities. The Trust Company's letter, after stating that the results of its examinations were satisfactory to it, says: "We are prepared to accept said contract [deed] upon the express understanding and agreement" on the part of the Construction Companies that they will complete the installation of the machinery and appliances necessary for a high tension service on the railways of the Traction Company. The Trust Company was prepared "to accept" the contract—that is, to admit and agree to it, to accede to or assent to it. It was prepared to agree to the contract as drawn up—not in some modified form. The proposition was, not that the deed should be changed or modified in any particular, but that the Construction Companies should make an additional or supplemental agreement in consideration of the Trust Company's agreeing to the deed. It relates to the execution of the deed—not to the provisions contained in the deed. The plain import of the language of the letters is, that if the Construction Companies would make the desired agreement relating to the instrumentalities for a high tension service, the Trust Company would become a party to the deed. It is immaterial whether this proposition of the Trust Company arose from dissatisfaction with the results of the examinations made under the provision of the deed, by which the deed was not to take effect as to that company unless the results were satisfactory, or whether it arose from some other cause. If it arose from this cause, and the expression of satisfaction in the letters was intended to be conditioned upon the making of the promise proposed, the deed would have to be

modified, or a supplemental contract would be necessary, to comply with the proposition. The deed itself did not provide for such contingency, otherwise than that in such case it should not be effective as to the Trust Company. This provision is in the nature of a condition subsequent, by which the deed might be defeated for the cause named. Anson Cont., ss. 356 et seq. It does not provide for a change in the terms of the deed that will secure satisfactory results. That matter is left open for future negotiation and contract, if the parties would avoid a defeasance of the deed. Lovell, as president of the Construction Companies, assuming to act for them, made the proposed agreement, and the Trust Company executed the deed. It thereby agreed to accept the deed, and bound itself to its provisions.

Nor does the evidence tend to prove that the parties intended to merge the deed in a single simple contract covering all the subjects contemplated by them, if the law would allow such merger,—a point that has not been considered. *Hydeville Co.* v. *Company*, 44 Vt. 395; *Canal Co.* v. *Ray*, 101 U. S. 522; Bish. Cont., ss. 133, 136. If such had been the intention, it is inconceivable that the parties would take pains to execute the contract of December 28 by itself, as a deed. It would have been a simple matter to adopt in the letters the terms of that instrument, expressed in full or by reference, and thereby avoid the execution of the deed and consequent liability to a misunderstanding of their intention. The acceptance and execution of the contract as a deed is well-nigh, if not absolutely, conclusive evidence that it was not intended to be merged in a simple contract. If corroborative evidence were necessary, it is found in the fact that the persons who acted as agents of the corporations in executing the deed were different from the persons who took part in the correspondence,—the agents of the Connecticut Company who executed the deed being Lovell and Pride, while Lovell alone signed the letter, and the agents of the Trust Company who signed the deed being O. W. Bright, second vice-president, and L. Carroll Root, secretary, while the letter in behalf of that company was signed by A. M. Hyatt, vice-president. This evidence has a strong tendency to prove that the acts were in fact several.

The deed is complete in and of itself. The plaintiffs challenge this proposition because of the provision by which the contract was not to take effect as to the Trust Company until the examinations in progress by the company's agents were completed, and not then unless the report of the examiners should be entirely satisfactory to the company. This provision postponed the time when the contract was to take effect, but it does not affect the completeness or validity of the contract. By it, the Trust Com-

pany reserved the right to defeat the contract if the examiners' report was not satisfactory. It reserved no right to defeat it for any other reason. It could not exercise this right arbitrarily and without reasonable cause. But if, as seems agreed, the sealed contract and the letters were signed and delivered at the same time, the contract became complete at that time, according to the plaintiffs' theory, since the report had then been made and the Trust Company's letter expresses its satisfaction therewith. The subject of the high tension service is not treated of or referred to in the deed. This subject is wholly independent of the subjects of the provisions therein contained. It seems to have been an afterthought, occurring after the preparation of the deed. The letters cover this subject completely, in and of themselves. It is true that a compliance by the Connecticut Company with the promise contained in the letters would reduce its net assets, after the satisfaction of its obligations, below what they would be if the deed had been the only contract between the parties; but this fact has no probative force in proving that the promise was intended to be included in the deed. Such would be the result, alike whether all the contractual provisions were incorporated in a single contract, or in a main and supplemental contract. Suppose the agreement relating to the installation of machinery and appliances for a high tension service had been made directly with the railway corporations, and the Trust Company had declined to accept the deed until it was made: Could there be any doubt that such agreement would be collateral to the deed? It is not perceived how the fact that it was made with the Trust Company renders it any the less collateral in character.

The inherent natures of the documents, their terms, and the mutual independence of the subject-matters of their respective provisions have a very strong, if not conclusive, tendency to prove that the parties understood and intended the agreement evidenced by the letters to be supplemental to the deed. No evidence has been pointed out, or has been discovered, of sufficient weight to overcome this evidence. It is, therefore, held that the contracts together do not constitute a single, indivisible contract, as seems to have been held by the superior court, but they are two contracts,—a main contract evidenced by the deed and a collateral or supplemental contract evidenced by the letters,—the consideration of the latter being the execution of the former by the Trust Company.

Contracts so associated and related are not unknown to the law, and are held to be valid. *Hersom* v. *Henderson*, 21 N. H. 224; *Quimby* v. *Stebbins*, 55 N. H. 420; *Hutt* v. *Hickey*, 67 N. H. 411; *Proctor* v. *Wiley*, 55 Vt. 344; *Carr* v. *Dooley*, 119 Mass. 294;

*Riverbank Imp.*

*Durkin* v. *Cobleigh,* 156 Mass. 108; *Rackemann* v. *Company,* 167 Mass. 1; *Drew* v. *Wiswall,* 183 Mass. 554; *Chapin* v. *Dobson,* 78 N. Y. 74; *Shughart* v. *Moore,* 78 Pa. St. 469; *Welz* v. *Rhodius,* 87 Ind. 1; *American etc. Ass'n* v. *Dahl,* 54 Minn. 355; *Morgan* v. *Griffith,* L. R. 6 Exch. 70; *Erskine* v. *Adeane,* L. R. 8 Ch. 756; *Angell* v. *Duke,* L. R. 10 Q. B. 174; *DeLassalle* v. *Guilford,* [1901] 2 K. B. 215; Steph. Ev., *art.* 90. In *Durkin* v. *Cobleigh, supra,*—a case that may be taken as a fair sample of all the cases cited,—the plaintiff took from the defendant a deed of land described as bounded upon a street on the defendant's land, referring to a plan which showed the street, but the deed contained no covenant that the defendant would build the street or cause water to be introduced into it. The plaintiff alleged that, to induce him to buy the lot, the defendant orally promised to grade and build the street and to cause the city water to be put into it within a specified time. It was held that the alleged promise was an independent agreement, collateral to the deed, which, if proved, would entitle the plaintiff to recover damages for a breach of it. So, in this case, to induce the Trust Company to accept the contract of December 28, Lovell, in the names and behalf of the Construction Companies, promised the Trust Company that they would complete the machinery and appliances necessary for supplying the railways of the Traction Company with a high tension service. For a breach of this promise, the Trust Company might maintain an action of assumpsit (*Hutt* v. *Hickey, supra*), but not an action of debt or covenant broken, founded upon the deed.

The contract of December 28 having been duly executed by the Connecticut Company, and the agreement evidenced by the letters of January 3 forming no part of it, but being an independent, supplemental, or collateral agreement having no connection with it other than in the matter of consideration, and the Trust Company's title to the securities for which it is asked to account being dependent upon the validity of the main contract only, it is unnecessary to consider whether the collateral agreement is valid and binding upon the Connecticut Company or the plaintiffs. If this agreement is voidable by the Connecticut Company or the plaintiffs because Lovell had no authority to make it, or if it is void because of fraud, the fact does not affect the validity of the main contract and of the Trust Company's title. Nor is it necessary to consider the questions raised by the case relating to ratifications of the contract by the corporation or its stockholders, and relating to acquiescence therein by the plaintiffs or laches on their part, since its execution by the Connecticut Company through the agency of officers clothed with full authority in the premises renders all these questions immaterial. It may be remarked however,

in passing, that it appears the plaintiffs were informed of the contract of December 28 in the following January and considered it advantageous to them, and they expected the Trust Company would carry it into effect. If they did not understand its scope, it was their own fault. They appear to be business men of sound minds, and it must be presumed that they understood the contract when they read it. Although they did not expressly consent to the contract, it would seem that they acquiesced in it, knowing that the Trust Company was relying upon and acting under it.

The question, what remedy, if any, the Trust Company would be entitled to if the Connecticut Company attempted to disaffirm the collateral contract on account of Lovell's want of authority to make it, or on account of fraud, is also immaterial. If by reason of fraud, or accident and mistake, the Trust Company would have a right in such case to rescind the main contract, on the ground that the consideration for the company's becoming a party to it had failed (*Dow* v. *Harkin*, 67 N. H. 583; *Rackemann* v. *Company*, 167 Mass. 1), the Connecticut Company would have no such right, and the Trust Company might actively or passively waive its right. No attempt at rescission has been made; and it is extremely doubtful, to say the least, whether the Trust Company is now in a position in which it could exercise the right, if it ever had the right, the securities which it received under the contract having been converted into other property so that it cannot now restore them to the Connecticut Company and place the company *in statu quo*, actually or substantially.

As before stated, the general decree in favor of the plaintiffs is based altogether upon the court's findings and rulings relating to constructive fraud. The Trust Company's exceptions to these rulings are sustained, and consequently the decree must be set aside.

After the decree and findings had been filed, the Trust Company moved that the decree be set aside as against the law and the evidence, and that the bill be dismissed because there is no evidence upon which a decree for the plaintiffs, or either of them, can be sustained. The motion was denied upon the ground that there was evidence to support the decree, and the Trust Company excepted. While the motion was sufficiently broad in its terms to include the proposition that there was no evidence of intentional fraud that would support a decree for the plaintiffs, it is obvious that the court did not take that view of the motion. He states in his findings that he had not found it necessary to pass upon the issue of intentional fraud; and the case conclusively shows that his decree in favor of the plaintiffs is based altogether upon constructive fraud. He denied the defendants' motion because he

found and ruled that the evidence before him was sufficient to support the decree on that ground. Furthermore, a motion to dismiss the bill for want of sufficient evidence to support its allegations would properly come at the close of the plaintiffs' evidence, before the issues were submitted upon their merits. If it was denied and the defendants excepted, the decision would be reviewable upon its transfer to this court. But in this case the motion was not made until after the case had been submitted and decided, and it was not passed upon then. It would be a departure from the usual practice to take up and consider the question under these circumstances, and justice does not seem to require such course. According to the record, the question of intentional fraud is still before the superior court undecided. It is not before this court.

PARSONS, C. J., *concurring.* The decree for the plaintiffs rests upon the legal proposition that · the defendants are bound to account as trustees to the plaintiffs for the property of the Massachusetts Construction Company Incorporated received by them. The defendants' main contention, under their exceptions to the decree, is that they received the property in question under and in accordance with the terms of a valid contract with the corporation in which the plaintiffs are stockholders, and therefore cannot be compelled to account except as provided in that contract. This question lies at the foundation of the plaintiffs' case, and is, briefly stated, whether there is error of law in the ruling of the trial court, that upon the facts the defendants are bound to account as trustees for the property involved.

The plaintiffs are preferred stockholders without voting power in the Massachusetts Construction Company Incorporated, a corporation organized under the laws of Connecticut. The plaintiffs alleged in their bill that, through the fraudulent coöperation of all the defendants, all the assets of the plaintiffs' corporation were taken from it and the plaintiffs' interest therein rendered valueless. Upon these allegations the parties went to trial, and a decree was ordered for the plaintiffs against the Trust Company. Upon request of the defendants, the facts found upon which the decree was based are stated. It appears therefrom that the question of fraud in fact, which was, on the pleadings, the question tried and submitted to the trial court, has not yet been decided. The court adds to this statement, which would obviously, by itself, be fatal to the decree, other facts and rulings upon which the decree is based. In this situation the question is, whether the facts stated authorize the decree; and it cannot be assumed by the general decree that facts sufficient to authorize it were found. *Noyes* v.

*Patrick*, 58 N. H. 618; *Concord Coal Co.* v. *Ferrin*, 71 N. H. 33; *Allen* v. *Association*, 72 N. H. 525, 527; *Jaques* v. *Chandler*, 73 N. H. 376.

The bill charged that the defendants' fraudulent purpose was effected by means of two contracts between the Connecticut Company and the Trust Company, dated November 12 and December 28, 1901. The findings made relate entirely to the contract of December 28. There is much evidence, and findings are made, as to transactions between the parties antedating the contract of December 28 and the formation of the Connecticut Company. But although these matters may be of great importance upon the question of actual fraud, in discussing the ground upon which, in the present posture of the case, the decree can be sustained, if at all, it is only necessary to consider the findings as to this contract. Although the bill alleged fraud in fact, it appears that at the trial the plaintiffs took a further position. They claimed "that the transfers by the Connecticut Company to the Trust Company, under the agreements dated November 12 and December 28, 1901, were fraudulent in fact; or, if not made with wrongful intent, were mere bargains of the Trust Company with itself, as represented by its agents, and therefore it must account." Upon the issue of fraud in fact, the character of the contract, whether fair or "grossly inequitable," would be material and important; but if the facts disclose a situation in which the law conclusively presumes fraud, the fairness of the contract would be no answer to the charge. As there is no finding on the issue of actual fraud made by the pleadings, no facts as to the character of the contract, whether inequitable or otherwise, are reported, and no question in relation thereto is involved in the case. The defendants deny the charge of fraud in fact; but the questions which might be presented upon this issue are not now before the court.

Upon the second claim, the defendants say that "all contracts were made between independent parties." They do not contend in argument that if the contract involved in the finding was a mere contract of the Trust Company with themselves, made by their agents on both sides, the plaintiffs would be bound. That the same person cannot at the same time be the buyer and the seller of property to which he holds a fiduciary relation, is elementary. See authorities cited in *Pearson* v. *Railroad*, 62 N. H. 537; *Fisher* v. *Railroad*, 50 N. H. 200, 205. The question, therefore, upon the primary issue of liability, is whether it is found that the contract of December 28 was a contract of the Trust Company with themselves. The formal execution of and subsequent action under this contract—an instrument under seal—by the parties thereto was alleged in the bill and admitted in the answers. By

its terms, the interest of the Connecticut Company in certain securities and railways was sold and transferred to the Trust Company, and the parties entered into various engagements in relation to the securities and the construction and completion of the various railways. The plaintiffs do not claim anything under the contract; but the contention is, that because of the invalidity suggested no title to the property purported to be conveyed thereby passed to the Trust Company, and that therefore they must account therefor as trustees and cannot discharge themselves in accordance with the terms of the contract. The question, therefore, is merely whether the Trust Company acquired title to the property of the Connecticut Company by virtue of this contract.

The plaintiffs had no voting power in their corporation. The common stockholders having entire control of the corporation involving their own interests and those of the plaintiffs, the relation of trust between them and the preferred stockholders with an interest, but no voice, in the corporate management more clearly appears, than in the relation of the majority to the minority stockholders who have the right to take part in the meetings of the corporation. But in this respect it is said "the majority stand in much the same attitude toward the minority that the directors sustain toward all the stockholders." 2 Cook Stock & Stockh., s. 662; 1 Mor. Corp., s. 529; Farmers' etc. Co. v. Railway, 150 N. Y. 410, 430, 431. The relation, therefore, between the two classes of stockholders in this corporation is plainly one of trust. Any transactions of the common stockholders in violation of the duty imposed upon them by the trust relation would be a fraud upon the preferred stockholders. The relation between the common stockholders and the other party to a contract attempted to be made by them in behalf of the corporation might be such that the law would conclusively presume the transaction to be a fraud upon the preferred stockholders, without any investigation of its fairness, as, for instance, if Lovell, owning all the common stock, had attempted, through directors chosen by him for the purpose, to transfer all of the corporate property to himself. Or such a transaction might be in fact a fraud upon the non-voting stock if the parties having control of the corporation, induced because of private advantage to themselves, attempted to contract on behalf of the corporation upon terms "grossly inequitable" to the corporation, as, for example, if Lovell, because of the $6,000 salary secured to himself, attempted to transfer or have transferred the corporate property to the Trust Company for less than it was worth. A transaction of this character might be avoided for fraud; but the fraud which would avoid it would be fraud in fact, such as the plaintiffs alleged in their bill, but which has not yet

been found to exist. If the Trust Company, by their influence over Lovell, or by any means, induced him to fail in performance of his duty as trustee toward the plaintiffs, and to exercise his control over the corporation in the interests of the Trust Company instead of in behalf of the Connecticut Company, such a transaction would involve fraud in fact, which if it can be found on the evidence, has not been. Whether or not the evidence has any tendency to prove control in this way is not material to the present discussion.

The contract in question is set out in the record. It was drawn up on its date, but was executed " some days later." The precise date does not appear. It is not necessary to recite the contract in full. A brief reference to some of its provisions only will be sufficient. It provided, as already stated, for the sale of securities and railroad rights to the Trust Company. For these the Trust Company were to pay cash, and debentures of and stock in the New Hampshire Traction Company, a holding company organized and controlled by the Trust Company. The cash, debentures, and certificates were to be retained by the Trust Company. The cash was to be used to pay debts of the Construction Company which that company guaranteed did not exceed the amount of cash the Trust Company were to pay, and the debentures and certificates of stock were pledged to secure any excess indebtedness. The Trust Company were to furnish funds to complete the railways, and were authorized to carry on the construction in the name of the Construction Company, and were to have control of that company for that purpose. Such persons were to be chosen officers of the company as the Trust Company might desire, to remain in office at the pleasure of the Trust Company until the final completion and carrying out of all matters and things provided for in and by the contract, Lovell agreeing to furnish stock to qualify the directors and that he would, pending the carrying out of all the terms and conditions of the agreement, deposit with parties named certificates for all the common stock of the company indorsed in blank, as security for the faithful performance of the terms of the contract by himself and the Construction Company. The contract also provided for the employment of Lovell in and about the construction of the railways for the term of two years at a salary of $6,000 a year. It was further provided that the contract should not bind the Trust Company until an examination then being made by engineers and accountants representing the Trust Company was completed, and not then unless their report was entirely satisfactory to the Trust Company. December 31, the draft of the contract was laid before the directors of the Connecticut Company, at a meeting regularly called and held. By for-

mal vote, the officers of the company were authorized and directed to make, execute, and deliver the contract. The directors further voted that the execution of the said contract by the officers of the corporation in its name be and the same hereby is confirmed and adopted as the valid and binding act of the corporation. The officers were further directed by vote of the meeting to do whatever was necessary to give force and effect to the contract. None of the directors, or officers, or common stockholders of the Construction Company were, so far as the findings go, or so far as there is any evidence which has been pointed out, at this time stockholders, officers, or agents of the Trust Company. There is nothing in the findings or evidence establishing any fact which, in the absence of fraud in fact, invalidates as matter of law the assent of the plaintiffs' corporation given in this formal manner to the contract in question. The corporate assent, formally given without fraud, binds all the stockholders.

If the corporation in its entirety is not bound, it can only be because of something subsequent to the formal assent of the directors to a contract which, under the charter and by-laws of the corporation, they had power to make. It does not, as before stated, appear when the actual execution of the contract by the officers of the corporations took place. It appears to be conceded in argument that this was done January 3, 1902, when the result of the examination by the Trust Company's engineers and accountants was communicated to Lovell, as president of the Construction Companies. If it had not been understood that the formal execution would, or might, precede the completion of such examination, the provision of the contract that it should not be binding upon the Trust Company until then seems superfluous; but such provision may have been inserted out of abundant caution. Between the assent given by the directors and the passing of the letters of January 3, it appears that, December 31, three of the five directors of the Connecticut Company resigned, and Trust Company nominees were elected in their stead; and it is found that since December 31, at least, the Connecticut Company was merely an agency controlled by the Trust Company.

January 3, 1902, the Trust Company addressed to Lovell, as president of the Construction Companies, a letter stating that the examinations made under the contract have been completed, "that the results of said examinations are satisfactory to us, and that we are prepared to accept said contract upon the express understanding and agreement on the part of the" Construction Companies that they will pay the entire expense of the completion of the high tension service upon all of the roads now constituting the New Hampshire Traction Company. Lovell replied on the same

day, as president of both companies, agreeing in behalf of the companies to bear all the expense necessary for the high tension service. It was argued that none of the agreements entered into, or attempted to be entered into, between the corporations could become binding until January 3; that, as it is found that at that date the Connecticut corporation was merely an agency controlled by the Trust Company, any contract consummated after December 31 is invalid as matter of law. But the finding must be construed in the light of the evidentiary facts upon which it is based, the use made of it, and the other findings in the case. It is clear it was not intended to find such control existed at the time the directors gave the corporate assent to the instrument dated December 28, for no attempt is made to support the decree by any ruling that such votes were not effective in law as corporate acts. The finding "since December 31, 1901, at least" implies that if there was evidence tending to establish such relation at an earlier date, it was considered insufficient to establish the fact. The only fact reported as occurring subsequent to the vote of the directors and before January 1, at which date the agency relation is found to exist, is the substitution of nominees of the Trust Company for a majority of the existing board of directors. The finding is a statement of the legal result of this act, as understood by the trial court. But assuming that the three directors then chosen were so related to the Trust Company as to be incapacitated legally to represent the Construction Company in any dealings between the two corporations, there is no finding or evidence that these directors acted in any way as representatives of either party in the matter. If the corporation could not act through them, their dual relation did not prevent the corporations from acting. The remedy awarded in *Pearson* v. *Railroad*, 62 N. H. 537, was not an injunction restraining the corporations from contracting with each other while the same persons remained as directors of both corporations, but was the appointment of a trustee to manage so much of the business of the plaintiff's corporation as the existing directors were disabled to conduct. The incapacity in such cases relates not to the corporations, but to the officers. That this was the understanding of the finding by the trial court is clear from the subsequent ruling. It was not ruled that the agreements entered into January 3 were void because of the control then had by the Trust Company over the Construction Company; but after · setting forth the action of the directors, December 31, and the letters, the court says "there was no other acceptance of the modified contract, except by implication from action subsequently taken under it," and the rule upon which the liability of the defendants is made to depend is further stated as follows: "The

so-called contract of December 28, as modified by the Trust Company January 3, if ever agreed to by the Connecticut Company, was so ratified after the Connecticut Company was controlled by the Trust Company. Taking the property in this way, the Trust Company is chargeable as a trustee." The only use made of the control found is to prevent acquiescence and action in carrying out the terms of the contract, by the persons then in control of the Construction Company, operating as a corporate estoppel against that company. It is further found that "by the contract of December 28, the control of the Connecticut Company was turned over to the Trust Company."

It seems clear that the agency of the Connecticut Company for the Trust Company is found to result from the provisions of the contract of December 28, and that it was not intended to find that the contract of December 28 or January 3 resulted from, or was tainted by, such control. The corporate assent to that contract was given by a board of directors legally capable of representing the corporation. The officers who performed the manual execution and delivery, whenever that was done,—Lovell, president, and Pride, secretary,—were not incapacitated by any relation to the Trust Company. Their act in so doing was purely ministerial, and in so acting they represented the corporation; and having been legally authorized to perform the act, their power to do so as representatives of the corporation was not affected by any vacancy or change in the board of directors. 1 Mor. Corp., *s.* 534. Taken by itself, it is clear that the agreement of December 28, executed with due formality by both parties, is valid and binding upon the plaintiffs' corporation.

The sole remaining question on this branch of the case is whether the letters of January 3 rendered the agreements of either or both of the parties contained in the sealed instrument nugatory and void. By that instrument the Connecticut Company sold and the Trust Company bought the property for which the plaintiffs seek to charge the Trust Company as trustees. The defendants' title is valid under that instrument, and they cannot be compelled to account except according to its terms, in the absence of fraud in fact, only because of the legal effect of the letters exchanged January 3 between the vice-president of the company on one side and the president of the companies on the other. The theory of the trial court appears to have been that these letters, with the agreements previously reduced to writing and at some time adopted under seal, constituted a new contract which Lovell, as president, had no power to make, and because of Lovell's want of power to bind the corporation as to the stipulation in reference to the high tension service, no contract was in fact

made and no title passed; and that the only legal principle by which the Connecticut corporation could be held to be bound was that of ratification by subsequent action or acquiescence. It may be conceded that the control found prevents, as matter of law, such corporate ratification as would otherwise result from the facts found, and that Lovell, as president, did not have power to bind the corporation to pay for the high tension service, as his letter of January 3 purported to do. The defendants do not assent to the latter proposition. In the view that has been taken, it is not necessary to decide the question of Lovell's authority in the matter, but it may be remarked that such authority does not attach to the office of president   *Wait* v. *Association*, 66 N. H. 581. If there is evidence tending to show that the entire management of the corporation and of all its business had been entrusted to Lovell (*Jones* v. *Williams*, 139 Mo. 1,—37 L. R. A. 682), there is no finding to that effect, and the evidence does not establish the fact as matter of law. Whatever authority Lovell might have had under the general vote of the directors of November 11, 1901, to which attention has been called, in the absence of the specific authorization of December 31, the latter vote prescribed the terms upon which the officers were authorized to convey the property specified in the contract, constituting all the remaining assets of the corporation, and abrogated any authority to convey them upon other or different terms, if such authority could be found in earlier votes or other prior action. But conceding that Lovell had no authority to bind the corporation by his promise that it should pay for the high tension service, and that he did not do so by his letter of January 3, the conclusion of the trial court, that for that reason there was no contract between the corporation and the Trust Company, and that the Trust Company took the property without any title, is nevertheless erroneous. Upon the whole transaction, giving full effect to the stipulations of the letters, it is clear the Construction Company agreed to sell and the Trust Company agreed to buy the property. In the negotiations the Trust Company attempted to secure an agreement from the Connecticut Company that that company would pay for the high tension service. The discussion is hampered by the paucity of the facts reported as to the execution and delivery of the sealed instrument dated December 28. If this paper was executed and delivered, as might be inferred from its terms, in advance of the completion of the examination of the Trust Company's engineers and accountants, it became binding at once upon the Connecticut Company, and binding upon the Trust Company upon the completion of such examination, if the reports of such examination were entirely satisfactory to the Trust Company. In such situation, the contract

became binding upon the Trust Company by force of the acknowledgment contained in the Trust Company's letter of January 3, that the examinations provided for by the contract had been completed and that the results of such examination were satisfactory to them.  Upon such a state of facts, the attempt of the Trust Company to add an additional stipulation to a contract already completely executed and binding upon them would have been entirely ineffectual, and Lovell's assent thereto, if otherwise effective as the act of the corporation, would be invalid for want of consideration.  But if the expression of satisfaction contained in the Trust Company's letter, because of the stipulation as to a further agreement by the Construction Companies, must be interpreted as a limited or qualified satisfaction which would not of itself render the contract binding upon the Trust Company, it nevertheless appears from the pleadings and admitted facts that the Trust Company did accept the contract, took the property thereunder, and proceeded to deal therewith in accordance with its terms.

It is to be noticed that the parties executing the sealed instruments in behalf of the several corporations—Bright, second vice-president, and Root, secretary, for the Trust Company, and Lovell, president, and Pride, secretary, for the Construction Companies— are not the same individuals who represented the parties in the transactions of January 3—Hyatt, vice-president, for the Trust Company, and Lovell alone, for the Construction Company.  This evidence would have a tendency to establish that the formal execution of the different papers was not contemporaneous.  There is other evidence reported which, with the terms of the paper itself, tends to show that the formal execution of the sealed instrument was earlier than January 3.  If this were so, the contract became binding upon the Trust Company when they proceeded to act under it, whether their satisfaction with the reports of their engineers and accountants resulted entirely from the reports themselves, or from the additional fact that Lovell, as president of the Construction Companies, had agreed for them that they should pay the high tension expense.  If the contract was executed and passed before the completion of the examinations, the Connecticut Company, upon proof of the completion of such examinations and that their results were "entirely satisfactory" to the Trust Company, could have required the Trust Company to take the property and proceed with the execution of the contract, or pay damages for the breach.  But the Trust Company having taken the property and proceeded to execute the contract, the question of satisfaction by which it was to become binding upon them is entirely immaterial.

But since it may have been found that the execution of the sealed instrument was contemporaneous with or subsequent to the letters, it must be concluded the fact was so found if such finding will tend to support the conclusion of the trial court. *Jaques* v. *Chandler*, 73 N. H. 376; and authorities *supra*. It is therefore necessary to consider the transactions upon the supposition that the contract dated December 28 was not executed by the Trust Company and exchanged between the parties until the time of, or after, the exchange of the letters of January 3. The letter of the Trust Company expressed their willingness to accept the contract already drawn up and assented to by the Connecticut Company, "upon the express understanding and agreement" that the Construction Companies would pay for the high tension service. The argument appears to be that the Connecticut Company has never entered into a valid agreement to pay for the high tension service; hence the Trust Company has never accepted the contract, and therefore there was no contract and no sale. But even if the Trust Company proposed as a condition of its entering into the contract that the Construction Companies should by a valid agreement bind themselves to pay the cost of the high tension service, such a proposition did not necessarily prevent the Trust Company from accepting, becoming a party to, and attempting to carry out the contract without such agreement on the part of the other companies.

If the Connecticut Company never bound itself to meet the expense of the high tension service, it is equally clear that the Trust Company definitely accepted the contract of December 28 by formally executing the same, by affixing its seal and the signatures of the proper officers, and by proceeding to carry it into execution. If the Trust Company was misled into so doing by mistake or misrepresentation as to Lovell's authority in the premises, the contract of sale would not be void, even if it might be avoided by an election of the party misled to rescind the contract and return what had been received under it. But as under such circumstances the contract would not be void, the Trust Company acquired a valid title to the property, good until it should elect to rescind and return it. But it is difficult to find legal ground for such rescission. The Trust Company dealt with the plaintiffs' corporation through its president as its agent. They knew that as president, merely, he had no implied power to bind the corporation. While suggesting that they required the express agreement of the Construction Company as a preliminary to their acceptance of the contract, they did accept it upon the assurance of the president and waived the corporate action which was necessary to make the agreement asked for binding upon the corporation. In the shape matters then stood,

it may be clear why, as a practical proposition, the assent of Lovell, the common stockholder, was considered sufficient; but nothing appears upon which it could be found that the Trust Company accepted the contract upon the mistaken belief that the corporate assent of the Construction Company had been given to the installation of the high tension service at its expense. There is no suggestion of any representations by Lovell as to his power in the matter by which they could have been misled. If the Trust Company cannot rescind the contract because of the refusal of the Connecticut Company to recognize Lovell's authority to modify the terms of the sealed instrument, it is very clear the Connecticut Company cannot do so; and even if on any ground the Trust Company could rescind, until they did so the contract would be binding upon the other party. *Butler* v. *Northumberland*, 50 N. H. 33, 39; *Willoughby* v. *Moulton*, 47 N. H. 205, 208. "The right to abandon a contract vests only in the party who has been guilty of no default." 1 Chit. Cont. (5th Am. Ed.) 741; *Greeley* v. *Wyeth*, 10 N. H. 15; *Bryan* v. *Bancks*, 4 B. & Ald. 401; *Clough* v. *Railway*, L. R. 7 Exch. 26, 34. The Connecticut Company agreed to sell their property to the Trust Company upon the terms embodied in the sealed instrument. If they did not agree and are not bound to pay the high tension expense, they get full relief by a discharge from the obligations of that agreement.

In addition to what has been said, there is a technical reason fatal to the conclusion of the trial court, assuming that the exchange of letters was anterior to or contemporaneous with the execution of the sealed instrument. When parties engage in negotiations by parol looking to the making of a contract, and do make such contract in writing, all stipulations by parol anterior to or contemporaneous with the written agreement are merged in the writing, which is conclusively presumed, in the absence of fraud or mistake, to contain the matter as to which the minds of the parties met. Where the final expression of the purpose of the parties is by specialty,—a writing under seal,—all other matter in writing is in parol and merged in the sealed instrument. Whatever the parties may have proposed orally or in writing as to the terms of their proposed treaty, the final expression of their agreement is the writing under seal, which cannot be contradicted or altered by any anterior or contemporaneous writing of less degree. This is not merely a rule of evidence, but a rule of substantive law. 4 Wig. Ev., ss. 2400–2455; Stark, Ev. (3d Am. Ed.) *995. The defendants suggest that an agreement which is collateral to, or independent of, the stipulations of the written or sealed instrument may be proved, even if the proof rests in parol. *Hutt* v. *Hickey*, 67 N. H. 411, 417; *Durkin* v. *Cobleigh*, 156 Mass. 108;

*Morgan* v. *Griffith*, L. R. 6 Exch. 70; and numerous authorities cited by them. The question in these cases is as to the proof or binding effect of the collateral agreement, which may be proved and enforced if collateral or independent, but if otherwise is merged in the written agreement which is not affected by a parol agreement which is not capable of proof. If the defendants are wrong in their contention that the stipulation of the letters is independent of, or collateral to, the stipulations of the sealed instrument, the only result would be the legal conclusion that the sealed instrument contains the entire matter to which the parties finally agreed; while if they are right, and the matter of the letters is open, the evidence that the Connecticut corporation did not become bound thereby would establish one of the steps necessary to a rescission by the Trust Company, but would not, as has been seen, render the contract void or voidable by the Connecticut Company. Whether, therefore, the stipulation of the letters is collateral or independent is not material, for neither conclusion would render the sealed instrument void.

As legal assent binding upon the plaintiffs' corporation was duly given to the taking by the Trust Company of the property in question, the conclusion of the trial court that the Trust Company is bound to account as trustee for the property so taken cannot be sustained; and the decree resting upon that conclusion of law must be set aside and the case stand in the superior court for a finding upon the undecided issue now before that court. The error in the finding lying at the foundation of the decree renders the consideration of the other objections urged by the defendants unnecessary at this time. If considered, the only decision that could be made would be as to their validity, or otherwise, as an answer to the decree upon the ground upon which it was placed. If the main question presented by the pleadings is decided in favor of the plaintiffs, the facts upon which such finding may be based may be material and important upon the other questions which have been suggested. It is not advisable to consider them at present, further than to say that the finding that if the defendants "are chargeable only for the value as determined by subsequent developments, then the property was never worth as much as they paid for it" is not understood to be a finding that the defendants paid full value for the property. If the defendants are obliged to account for the property, they would in any event be chargeable with its value when they took it. Subsequent developments would be evidence, but not the only evidence, on this question. Whether there is any evidence of actual fraud does not appear to be one of the questions transferred, and is not properly considered by this court while the question of fact remains

open in the trial court to which it was submitted without any
objection of this character.

*Case discharged.*

WALKER and BINGHAM, JJ., concurred in the foregoing opin-
ions:   YOUNG, J., dissented.